# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Township of Radnor,<br>                    Appellant | : | |
| | : | |
| v. | : | No. 1665 C.D. 2019 |
| | : | |
| Goshen Holding Company, Inc.<br>and C.F. Holloway, III | : | |
| | : | |
| Township of Radnor | : | |
| | : | |
| v. | : | No. 1691 C.D. 2019 |
| | : | |
| Goshen Holding Company, Inc. and<br>C.F. Holloway, III | : | |
| | : | |
| Appeal of: Jeffrey S. Rosenblum and | : | |
| Leonor R. Rosenblum | : | ARGUED:  June 12, 2020 |

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
                       HONORABLE ELLEN CEISLER, Judge
                       HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                     FILED:  July 20, 2020

In these combined appeals, respectively submitted by Appellant Township of Radnor (Township) and Appellants Jeffrey S. and Leonor R. Rosenblum (Rosenblums), the issue before this Court is whether the Court of Common Pleas of Delaware County (Trial Court) properly concluded that a lot owned by Goshen Holding Company and Caswell F. Holloway, III (collectively, Appellees) is not restricted from being developed. After thorough review, we vacate the Trial Court's July 22, 2019 order denying the Township's and the Rosenblums' respective

Motions for Post-Trial Relief and remand for additional proceedings consistent with this opinion.

## I. Background

### A.

On September 22, 1997, C.F. Holloway, III & Company (CFH Company) entered into an agreement of sale to purchase the Norris Estate, a 21.858-acre property located at 800 Goshen Road in Radnor Township, Delaware County, Pennsylvania, from the Trustees of the University of Pennsylvania (University). Reproduced Record (R.R.) at 1103a-27a. The CFH Company, which was owned and operated by Caswell F. Holloway, III (Holloway), desired to transform the Norris Estate by subdividing it and building multiple homes thereon, in order to create a development to be known as "Montparnasse." Trial Ct. Decision, Findings of Fact (F.F.), ¶¶11-13. Per the terms of the agreement of sale, the CFH Company agreed to pay the University $1,150,000, plus an additional "$85,000[] for each [b]uilding [l]ot in excess of six . . . for which [a]pprovals are obtained [from the relevant governmental entities]." R.R. at 1109a.

On December 16, 1997, the CFH Company filed a preliminary subdivision plan application with the Township detailing the CFH Company's vision for Montparnasse. *Id.* at 1135a. This preliminary plan shows nine lots: Lots 1 through 8 are each buildable and abut a cul-de-sac. *Id.*; Trial Ct. Decision, F.F., ¶20. Lot 9 covers a large portion of Montparnasse's eastern side, with thinner tails that curl across its northern and southern edges. On the preliminary plan, this is described as "**Lot 9 Open Space** 413,339 [square feet] (9.489 [acres])[.]" R.R. at 1135a (emphasis added).

2

This preliminary plan was reviewed at both the local and county levels. The Township's Planning Commission considered the CFH Company's preliminary plan for Montparnasse at a meeting on January 7, 1998. During the course of the meeting, "**Holloway . . . noted that Lot #9 will be granted to a [c]onservancy or dedicated to the Township or [the Montparnasse] [H]omeowners [A]ssociation and will be deed restricted from any development**." *Id.* at 1130a (emphasis added). On January 15, 1998, the Delaware County Planning Commission issued a review letter, in which it noted that the CFH Company proposed to "[s]ubdivide 21.858 acres into 8 building lots and 1 open space lot[,]" and recommended that the CFH Company be allowed to create a final subdivision plan for Montparnasse. *Id.* at 1131a. On February 2, 1998, the Township's Planning Commission again considered the preliminary plan. During the course of this meeting, John Snyder, the CFH Company's attorney, stated that **"Holloway [was] looking for a conservancy**[,] **which will be responsible for Lot #9 in the future."** *Id.* at 1148a (emphasis added). Though some members of the Planning Commission and the general public expressed concerns about the preliminary plan, it was nonetheless approved by the Planning Commission. *Id.* at 1148a-49a. On February 19, 1998, the Delaware County Planning Commission[1] issued another review letter for Montparnasse, which stated:

> Currently, the proposal remains the same, to subdivide 21.858 acres into eight building lots and one open space lot. Current plans show some lot line configurations which have changed from the preliminary plan reviewed in

[1] According to Dennis DeRosa, former Manager of the Delaware County Planning Commission's Plan and Ordinance Review Department, the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202, requires County-level planning commissions to review all subdivision and land use plans and make recommendations to the relevant municipality about what should be done with each plan. *See* Notes of Testimony (N.T.), 11/27/18, at 28-29.

January [1998] to allow [preservation of] more of the existing stone wall, which will be used as a common walkway, to be located within the common open space (Lot 9 – 9.489 acres).

*Id.* at 1151a.

On March 9, 1998, the Township's Board of Commissioners unanimously voted in favor of Resolution 98-06, thereby approving the CFH Company's preliminary plan application for Montparnasse. The text of this Resolution noted that the preliminary plan called for **"subdivid[ing] 21.858 acres into nine lots, eight of which are building lots at 800 Goshen Road[.]"** *Id.* at 1156a-57a, 1162a (emphasis added). On March 10, 1998, B. Duncan Hubley, the then-Township Engineer, sent a letter to Holloway and the CFH Company, informing them that the Township had approved the preliminary plan and that the next step was for the CFH Company to prepare a final development plan that complied with the requirements set forth in the Township Code. *Id.* at 1163a.

On March 19, 1998, the Township's Zoning Hearing Board (ZHB) held a public hearing regarding Goshen Holding Company's (Goshen Holding) request for a special exception, one which would authorize construction of sanitary and storm sewers in a steep slope area of the proposed Montparnasse development.[2] During the course of the ZHB hearing, Holloway stated that

> **[Lot 9] is a nine-acre parcel of what we're proposing as open space which runs alongside the Darby Creek and protects the majority of the steep slopes that are on the site.**

---

[2] The Reproduced Record does not contain a deed memorializing the sale or transfer of the Norris Estate from the CFH Company to Goshen Holding, but there is no dispute that such a sale or transfer occurred at some point, or that Holloway is the principal owner of both entities. *See* ZHB Hr'g Tr., 3/19/99, at 4; Trial Ct. Decision, F.F., ¶¶3-4, 9-12.
**(Footnote continued on next page…)**

4

> It also includes the original carriage drive trail, which is a **non-macad[a]med**[3] drive that has a stone wall and has been determined to have historical significance. And that is to be totally preserved.

ZHB Hr'g Tr., 3/19/98, at 7. In addition, Holloway had the following exchange with ZHB Member Kathy Bogosian regarding how Holloway intended to dispose of Lot 9:

> Bogosian: **The open space, is that being held in private ownership by the houses?**
>
> [Holloway:] **Our intent is to deed it to the homeowners.**
>
> []Bogosian: **Restricted through just those homeowners?**
>
> [Holloway:] **Yes, it will be. As a matter of fact, we are planning to discuss the possibility of a conservation easement with the National Land Trust or Brandywine Conservancy.**

*Id.* at 8 (emphasis added). On March 19, 1998, the ZHB unanimously approved Goshen Holding's special exception application.

On May 4, 1998, the Township's Planning Commission considered the CFH Company's final subdivision plan application for Montparnasse at its regularly scheduled meeting.[4] The minutes for this meeting reflect that:

> **[Township Planning Commission Member] Mr. De Stefano asked who will be responsible for the open space on Lot #9. The applicant was requested to include a deed restrict[ion] for Lot #9 on the Record Plan. . . . Snyder, the attorney for the applicant, stated**

---

[3] Macadam is a type of pavement. *See Macadamize*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/macadamized (last visited July 17, 2020) (defining "macadamize" as "to construct or finish (a road) by compacting into a solid mass a layer of small broken stone on a convex well-drained roadbed and using a binder (such as cement or asphalt) for the mass").

[4] It is unclear why the Township Planning Commission's meeting minutes list the CFH Company as the applicant, when, as already mentioned, ownership of the Norris Estate had already been transferred from the CFH Company to Goshen Holding.

**that a homeowners association will be responsible with
a conservation easement created on it, but did not want
to note this on the plan**.

R.R. at 1222a (emphasis added). The Planning Commission then approved the final subdivision plan, subject to 13 conditions. *Id.* at 1222a-23a. On May 5, 1998, Hubley sent a memorandum to the Township's Board of Commissioners, notifying them of this decision; the memorandum lists 14 conditions of approval, *albeit with number 13* ("[t]hat Lot #9 be deed restricted with a conservation easement") *crossed out by hand*. *Id.* at 1226a-27a.

On May 14, 1998, Hubley sent a letter to Holloway and the CFH Company, to which Hubley attached proposed Resolution 98-11 for Holloway's consideration. *Id.* at 1228a. Hubley directed Holloway to review the proposed resolution, which had 17 attached conditions, and return it to Hubley within 5 days, so that the Township's Board of Commissioners could approve the resolution at its scheduled meeting on May 26, 1998. *Id.* Holloway reviewed the proposed resolution and approved it on May 18, 1998, with the exception of proposed condition 13 ("[t]hat Lot #9 be deed restricted with a conservation easement"), which Holloway crossed out by hand and initialed. *Id.* at 1230a-31a.

On May 21, 1998, the Delaware County Planning Commission issued a review letter, in which it recommended approval of the final plan. *Id.* at 1234a. Therein, it noted that "[c]urrently, the proposal remains the same [as that envisioned through the preliminary plan], to subdivide 21.858 acres into eight building lots and one open space lot. The proposed open space lot is 9.589 acres and contains a dry stone wall, which will be used as a common walkway." *Id.*

On May 26, 1998, the Township's Board of Commissioners unanimously approved Resolution 98-11. *Id.* at 1241a. This resolution, which noted that the **"[CFH Company had applied] to subdivide 21.858 acres into nine lots, eight of**

6

**which are building lots at 800 Goshen Road,"** was approved subject to the 16 conditions that had been accepted by Holloway on May 18, 1998. *Id.* at 1245a-46a (emphasis added). The CFH Company subsequently revised its final plan for Montparnasse to satisfy these conditions and submitted a finished version to the Township on September 20, 1998. *Id.* at 1250a-51a.

On October 14, 1998, Snyder called Eugene Evans, the Township's then-solicitor, to discuss Lot 9. *Id.* at 1252a. Snyder then sent Evans a letter memorializing their discussion, in which Snyder wrote:

> As we discussed on the phone today, the subdivision plan contains the words "open space" in relation to Lot 9. As you know, Lot 9 is not restricted against development either by Township Ordinance or by any requirement of Township approval**. It is my client's intention, however, to offer a Conservation Easement on this lot as a gift and thereafter maintain it as open space**. **I need a letter from the Township for use in the appraisal and tax audit of the charitable contribution of the Conservation Easement acknowledging that Lot 9 is not restricted as open space nor required, from the approval process, to be open space within the plan.** The letter should acknowledge that Lot 9 is an otherwise buildable lot subject only to Township review and approval for access, storm water and compliance with all applicable building regulations. I would appreciate a letter from you addressed to me as attorney for Goshen Holding . . . acknowledging on behalf of the Township the points contained in this letter. Thank you for your assistance.

*Id.* (emphasis added).[5]

---

[5] Evans died years before the Township initiated its lawsuit, so there was no way for the parties to question him about his exchanges with Snyder.

**(Footnote continued on next page…)**

7

On October 19, 1998, the Township approved the finished version of the Montparnasse final plan. *Id.* at 1250a.[6] This final plan describes "Lot 9" as "**Open Space** 412,076 [square feet] (9.460 [acres])[.]" *Id.* (emphasis added). That same day, Goshen Holding made settlement on the Norris Estate, in the amount of $1,320,000. *Id.* at 1316a. This amount reflects that the Norris Estate had been approved for subdivision into eight buildable lots and one open space lot, with the agreed-upon base payment to the University of $1,150,000, plus an additional $170,000 for the number of buildable lots in excess of six. *See id.* at 1109a; N.T., 11/26/18, at 86.

On October 20, 1998, Township Solicitor Evans responded to Snyder via letter, stating:

> This is to confirm that even though the [final approved] subdivision plan [for Montparnasse] contains the words "open space" in relation to Lot 9, Lot 9 is in fact not restricted against further development either by [T]ownship ordinance or by any requirement of [T]ownship approval. **Lot 9 is a buildable lot subject to any [T]ownship review and approval for access, storm water and compliance with all applicable building regulations.**

R.R. at 1318a (emphasis added). Despite this, Holloway did not inform the University that he was now blessed with another buildable lot, nor did he pay the University an additional $85,000. N.T., 11/26/18, at 86-87.

### B.

Appellees subsequently began marketing Montparnasse to potential homebuyers. In furtherance of this, they produced an ornate booklet, in which they made the following statement: "The Montparnasse site was creatively engineered to ensure that the existing main house could be preserved on 4.5 acres accessed by its

---

[6] The final plan was recorded with the Delaware County Recorder of Deeds on October 23, 1998. N.T., 11/26/18, at 91; R.R. at 1254a.

own private drive. **Overlooking more than nine acres of preservation space** and Darby Creek, its majestic integrity is not compromised but enhanced by its lovely new neighbors." R.R. at 1087a (emphasis added). In addition, the booklet contained a multicolor, pen-and-ink drawing, showing eight large homes each accessible via a cul-de-sac and private driveways, bordered to the north and east by woods extending to the horizon; in a cutout section in the lower right-hand section of the drawing, Lots 1 through 8 are clearly shown as buildable lots with housing footprints, while Lot 9 (which is not titled as such in the cutout section) is essentially blank, containing only an unidentified line (which is presumably the old carriage drive trail) and the notation "9.46 Acres[.]" *Id.*

On May 5, 1999, Snyder sent Township Solicitor Evans another letter, through which he indicated that Appellees were open to transferring ownership of Lot 9 to the Township. *Id.* at 1319a. Specifically, Snyder wrote:

> Holloway, principal of Goshen Holding . . . obtained approval of a nine lot subdivision now known as Montparnasse at the corner of Goshen and Darby/Paoli Roads. If you remember, the Township approved eight of the lots as building lots. The ninth lot was larger than the rest and encompassed the wooded hillside and Darby Creek Valley. **While this portion of the property could have been developed as a building lot, my client has elected not to do so at this time. In fact, as we represented to the [Township's] Planning Commission and the Board of Commissioners, we prefer to see that area as a conservation easement area.**
>
> We are now creating the conservation restrictions on the property and have discussed the many options for doing so. **The one that is most attractive is the concept of dedicating Lot 9 to the Township subject to two restrictions: the first would be that it be maintained as a conservation area; the second would be that public access and use of the conservation area be restricted to the area below the old estate access driveway which**

9

> **traverses the property**. . . . Would you please discuss this type of proposal with the Township and let us know of its interest, if any, in owning Lot 9? We now have our first agreement of sale for the [Montparnasse] property and need to reach some definition of the ultimate use of Lot 9 within the reasonably foreseeable future so that the buyers are aware of its intended use.
>
> Thank you for your assistance with this matter.

*Id.* at 1319a-20a (emphasis added). According to Holloway, he authorized Snyder to send this letter, because he was considering deeding Lot 9 to the Township via a conservation easement at that time: "Once we knew what the developable value of the property would be that we could deed it as a conservation easement, that area by the creek, for value. That was one of the considerations we had." N.T., 11/29/18, at 6. This idea never came to fruition, though, and it does not appear that Evans ever responded to Snyder's solicitation. *Id.*

On July 26, 1999, Goshen Holding completed its first sale by deeding Lot 1 to Robert and Carol Kutteh. R.R. at 1325a-28a. This deed was recorded with the Delaware County Recorder of Deeds on July 29, 1999. *Id.* at 1327a. That same day, Goshen Holding filed a "Declaration of Covenants, Restrictions, Easements, Charges and Liens for Montparnasse Homeowners Association, Inc." (Declaration). *Id.* at 1329a-42a. Among other things, this Declaration stated that Goshen Holding "intends to construct a residential community consisting of nine (9) single[-]family dwelling lots, together with improvement for the benefit of such community[,]" and listed nine handwritten lot identification numbers (although these numbers were not expressly identified as such). *Id.* at 1329a-30a. In addition, the Declaration gave Goshen Holding 10 votes for homeowner association matters, while each property owner received 1 vote. *Id.* at 1332a. Goshen Holding's voting power was to be reduced to a single vote when any of three events had occurred: "(a) when the entire

10

development is completed, and all Lots [have been] conveyed; or (b) [the current date has reached] December 31, 2004; or (c) voluntary termination of [preferential voting rights] at the sole discretion of [Goshen Holding], its successors and assigns." *Id.* Amending the Declaration required the approval of "two-thirds of the existing [Association membership] votes, and approv[al] in writing by the . . . Township['s] Board of Supervisors[.]" *Id.* at 1339a.[7] However, Goshen Holding was not required to give prior notice to or gain the approval of the Montparnasse Homeowners Association, Inc.'s (Association) other members in order to make "technical changes, corrections and clarifications to the Declaration." *Id.* (emphasis added). Goshen Holding retained the right to make such no-notice, non-substantive alterations up through when its preferred voting rights were extinguished. *Id.*

Lots 2 through 8 were sold to homebuyers between April 27, 2000, and July 25, 2002, leaving Lot 9 as the sole remaining lot in Montparnasse that was still owned by Goshen Holding. *Id.* at 1343a-46a, 1348a-91a.

## C.

On December 14, 2004, less than three weeks before Goshen Holding's preferential voting rights expired, Holloway convened a meeting of the Montparnasse Homeowners Association, with one of the subjects being Lot 9. The meeting minutes state, in relevant part:

> **3.) Discussion of Amended Declaration**
>
> . . . .
>
> > **f.** Lot 9 — Cas Holloway discussed the following:
> >
> > > **i.** Inadvertent reference to Lot 9 as "Open Space" on the recorded subdivision plan [for Montparnasse].

---

[7] This reference to "Board of Supervisors" is presumably a drafting error, as the Township has a Board of Commissioners, not a Board of Supervisors.

11

**ii.** Reviewed letter from . . . Township [Solicitor Evans] clarifying that Lot 9 is a buildable lot.

**iii.** Met with Nabil Henien [(owner of Lot 3)], who asked for a guarantee that an access road from Lot 9 to the cul-de-sac would not be developed between [his family's] lot (Lot 3) and the Turturro[s'] lot (Lot 4), even though such access is not economically feasible.

**iv.** Lot 9 was not originally required to pay [Montparnasse] Homeowners Association dues, unless it tied into the "Montparnasse Place" road. Lot 9 will now be permanently removed from the [Montparnasse Homeowners] Association and will act as a separate development.

**v.** Deed Restriction

> **1.** an approximately 60' wide deed[-]restricted area (2.429 acres of Lot 9's 9-acre lot) along Goshen Road and the carriage path to the strip of land between Lots 3 and 4, will act as a permanent buffer for Montparnasse.

> **2.** No clear cutting, improvements, structures, or vehicular access allowed within the deed-restricted area. Selective trimming, pruning and general landscape maintenance are permitted.

> **3.** Ted Wentz [(owner of Lot 7)] asked [Holloway] how long the deed restriction would be in place. [Holloway] told him it would be permanent.

> . . . .

> **7.** Jeff[rey] Rosenblum [(co-owner of 800 Montparnasse Drive / Lot 8)] objected to Lot 9 development and limits to the buffer.

12

. . . .

> **c.** Reviewed original discussions regarding use of Lot 9 — deed to [Homeowners A]ssociation versus Radnor Township.
>
> **d.** Jeff[rey] and Nabil indicated that their original understanding was that they were buying into an eight-lot subdivision. Ted Wentz and Augie Turturro stated that they were always aware that the [D]eclaration provided to them at closing stated that [Goshen Holding] had the right to develop [all] nine lots.

*Id.* at 1404a-05a (emphasis in original). The Montparnasse Homeowners Association then voted to approve Goshen Holding's motion to amend the Declaration, with 16 votes in favor and 2 members, including Mr. Rosenblum, abstaining. *Id.* at 1406a.

On January 31, 2005, the Township's Board of Commissioners held a special meeting, at which it considered Resolution 2005-02, which would authorize Goshen Holding's proposed Declaration amendment.[8] The minutes for that meeting read as follows, in relevant part:

> The Board [of Commissioners] asked why this issue was appearing before them. Nancy Cleveland, attorney representing Mr. Holloway, explained that when the original Declaration was recorded for Montparnasse, it

---

[8] Resolution 2005-02 is fairly simple. In essence, it notes the Board of Commissioners' previous approval in 1998 of Goshen Holding's final development plan for the Norris Estate, as well as the existence of the Declaration, which governed the Montparnasse Homeowners Association, as well as the requirement that the Board of Commissioners approve any amendments to the Declaration, and then authorizes Goshen Holding's proposed amendment to the Declaration and Declaration Plat. *See* R.R. at 1410a.

13

had a clause in it that required the Board . . . [to] approve any future amendments.

Mr. Holloway advised that Lot #9 is and always has been a buildable lot and was not a condition of approval on the original resolution[, *i.e.*, 98-11]. There had been a condition proposed by the Township for a **Conservation Easement** on this Lot; however, [Holloway] did not agree to that condition and so it was removed before the resolution was adopted. Mr. Holloway further advised that originally there was a proposed walking trail by the old carriage house driveway that the neighbors did not want.

John Snyder, attorney for [Goshen Holding], explained that Lot #9 was not listed as a buildable lot during the subdivision phase, it was listed as an extra lot of the subdivision. [Goshen Holding] knew that if [Lot #9] was ever to be built upon, it would require full studies and reports of access either off of Goshen Road or Darby Paoli Road and would need full engineering reports on that lot. He stated that lot averaging of the ground of lots 1-8 was used for the basis of developing Montparnasse; Lot #9 was not included in that figure.

[Board of Commissioners] President [Harry] Mahoney commended Mr. Holloway on being a [first-]class builder. However, because the plans were recorded showing Lot #9 as "open space," there was doubt about the plan's consistency with the Board's previous approval of the subdivision. Mr. Holloway explained that his engineering firm incorrectly inserted the words "open space" on Lot #9. He said that [L]ot [#9] was never intended to be undeveloped open space but knew that any development on that lot would have to go back to the Planning Commission with detailed plans for any development.

Mr. Holloway further stated that no engineering was ever done on Lot #9, no trees, topos,[9] etc., showing that he had intended for development of that lot to be a separate process. He has plans to deed restrict almost 2.47 acres of the 9 acres of [Lot #9] to provide a 60[-foot] buffer around the other 8 lots. Mr. Snyder also reminded the Board that

---

[9] It is unclear exactly what "topos" means in this context, but it is likely shorthand for topographical maps.

the 1998 Resolution [98-11] did not have any reference to Lot #9.

*Id.* at 1407a-08a (emphasis added). A majority of the commissioners then voted to table the matter and to reconsider it at their next hearing. *Id.* at 1408a.

On February 14, 2005, the Board of Commissioners again considered Resolution 2005-02. The minutes for this meeting are, in relevant part, as follows:

> Commissioner Paolino moved to approve version A of the [R]esolution, this was seconded by Commissioner Spingler. This version would allow [L]ot #9 to be considered a buildable lot. Commissioner Cannan felt it was best to leave [this] lot as open space and that a conservation easement would be the best solution to limit development. **He stated that the testimony given at the [ZHB] meeting on this issue did not match Mr. Holloway's current statements on this matter, and recommended that the Board of Commissioners not vote on this issue without further public discussion**. Commissioner Spingler stated that they should approve the [Resolution]. Commissioners Higgins stated that she had some problems with the timeline of the procedures during the original planning phase of this subdivision and that it was bad practice to approve preliminary planning plans while a zoning issue is outstanding. Commissioner Masterson stated that the number of lots applied for subdivision is significant. Commissioner Hervada stated that he spoke with the neighbors on this issue and agrees t[h]at [Lot #9] was meant to be open space and should be left as such.
>
> **Mr. Snyder, counsel for Mr. Holloway, then stated that the term "open space" was not defined in [the Township's Subdivision and Land Development Ordinance (SALDO)] and that "open space" in the [T]ownship code refers to yard space and that all options were kept open by using the term "open space."** In response to Commissioner Cann[a]n's statements regarding the testimony at the [ZHB], Mr. Snyder said that the transcript spoke to the intention at the time. Mr. Holloway then said that he has been straightforward with the Township during the entire process. He also stated that

15

[L]ot #9 could not be developed at that time due to the lack of access to the property, and he wants to settle the issue of [L]ot #9 so he can clean up the open space issue with the homeowner association of Montparn[a]sse.

Commissioner Paolino called to question[10] the [R]esolution at hand, Commissioner Higgins seconded the call to question, a vote was then taken on the call to question. The vote was 3 in favor and 4 not in favor. The call to question was denied, due to the lack of 2/3 vote needed to pass. After further discussion on the issue[,] a vote was taken as follows: Commissioners Mahoney, Paolino, Spingler and Masterson voting for and Commissioners Cannan and Hervada voting against. The [R]esolution was then passed.

*Id.* at 1469a (emphasis added).

On February 17, 2005, Goshen Holding's amended Declaration Plat[11] for Montparnasse Homeowners Association, which showed the Montparnasse development, was approved by both the Township and the Delaware County Planning Commission. *Id.* at 1403a. Goshen Holding then recorded the amended Declaration and amended Declaration Plat with the Delaware County Recorder of Deeds that same day. *Id.* Unlike the original 1998 final plan for Montparnasse, the amended Declaration Plat describes "Lot 9" as **"412,076 [square feet] (9.460 [acres])[.]"** *Id.* (emphasis added). There is no mention on the amended Declaration Plat of "Open Space." *See id.*

### D.

In 2009, the Pennsylvania Department of Transportation (PennDOT) obtained roughly half an acre of Lot 9 from Goshen Holding via eminent domain. N.T.,

---

[10] It appears from the context of the record that to "call into question" means to bring Resolution 2005-02 to a vote.

[11] A plat is "[a] map describing a piece of land and its features, such as boundaries, lots, roads, and easements." Black's Law Dictionary 538 (3d Pocket ed. 2006).

11/29/18, at 11-13, 27-28. PennDOT used this land to straighten Goshen Road and build a retaining wall the following year, thereby addressing a traffic issue that had been caused by a sharp bend in the road. N.T., 11/26/18, at 186-87; N.T., 11/28/18, at 258-59; N.T., 11/29/18, at 11-13. By doing so, PennDOT also created the potential for easier direct access to Lot 9, which had theretofore been impeded by cost feasibility and safety concerns. *See* N.T., 11/26/18, at 30-31, 87-88, 177, 180-81; N.T., 11/28/18, at 258-59.

On March 17, 2011, Goshen Holding applied for a grading permit from the Township as part of its effort to build a home on Lot 9. *See* R.R. at 1637a-38a. Daniel Malloy, who was the Township Engineer at that point, responded to this submission via a letter on April 20, 2011, in which he enumerated a handful of issues with the permit application that needed to be addressed before it could be approved. *See id.* at 1629a. On April 25, 2011, Goshen Holding submitted a revised grading permit application to Mr. Malloy. *Id.* at 1626a-28a, 1635a-36a. The grading permit application continued through the review process until April 5, 2012, when Kevin Kochanski, the Township's Director of Community Development, as well as its Zoning Officer, informed Holloway via letter that the application was denied. Kochanski explained:

> Please be advised that your permit is being denied for the following reasons:
>
> 1. The recorded land development plans indicate that Lot 9 is "Open Space." Open space is not able to be developed. Chapter 255, [the Township's SALDO,] defines open space as:
>
> "A portion of a tract available and accessible for use by the residents of the tract, unless dedicated to the Township, **generally undeveloped.** Open space may include areas of steep slopes, floodplains and other significant features to be preserved. **Open space shall not include** street or street rights-of-way, parking areas, **yards and lots of individual**

17

**dwelling units** or other public improvements nor does it include required buffer areas. Open space may include active and passive recreation."

In order to remove the "Open Space" note on Lot 9 of the Approved Final Subdivision Plan for [Montparnasse] . . . you will need to file a Revised Final Plan.

*Id.* at 1646a (emphasis in original). In addition, Kochanski stated that the grading permit application violated sections of the Township's Zoning Ordinance pertaining to disturbance of floodplains and steep slope areas. *Id.* at 1646a-47a. Kochanski's ruling was eventually found by the Township's ZHB to have been void *ab initio*, because ruling upon a grading permit application was outside the scope of his authority as the Township's Zoning Officer. N.T., 11/28/18, at 12-13. Even so, Goshen Holding did not elect to move forward with developing Lot 9 at that point.

**E.**

This changed on June 3, 2016, when Goshen Holding submitted a new, preliminary subdivision plan application to the Township for "800 Goshen Road[,]" one which called for splitting Lot 9 into three buildable lots and then erecting homes thereon. *See* R.R. at 1699a-1700a. On July 18, 2016, John Rice, the Township's current solicitor, responded by sending a letter to David Falcone, Goshen Holding's attorney, in which Rice stated:

As we have previously discussed, [the] Township has asked [me] to review [Goshen Holding's preliminary subdivision plan] application, as well as the plans and approvals for the previous 1998 Montparnasse subdivision that created the lot that is the subject of your current application (Lot 9) in order to determine restrictions on your client's right to subdivide this parcel. As you are aware, the 1998 subdivision plans . . . clearly denote Lot 9 as open space. This designation can be found both on the actual plan and in the notes listed on the plan. Moreover, the Township's approval resolution states that the approval was for a subdivision containing eight building lots and one non-building lot (Lot 9). We have also

18

discussed this matter with neighboring residents who resided on their properties at the time of this initial subdivision who have confirmed that your client promised that this ninth lot would remain open space and undeveloped. These recollections are supported by the sworn testimony Mr. Holloway made to the Township [ZHB] concerning this earlier subdivision and this affirmation is noted in the minutes of the various Township boards and commissions during their respective reviews of the 1998 subdivision [plans].

*Id.* at 1691a. Township Solicitor Rice informed Falcone that the Township's position was that the "Open Space" notation on the 1998 subdivision plans constituted a restrictive condition that barred Lot 9's development, as well as that the Township would be filing suit "to enforce the notes on the 1998 record plan and to confirm the status of Lot 9 as open space." *Id.* at 1691a-92a.

On July 21, 2016, the Delaware County Planning Commission issued a review letter pertaining to Goshen Holding's June 3, 2016 preliminary plan, recommending that the preliminary plan application be denied. *Id.* at 1693a. In relevant part, it stated:

A plan for [Montparnasse] was last reviewed by the Delaware County Planning Commission at its meeting on May 21, 1998, as a final subdivision. [Goshen Holding] proposed to create an eight parcel subdivision, a private access road, and to designate the remainder of the parcel[, *i.e.*, Lot 9] as open space.

. . . .

Lots 2 and 3[, which would be created through subdivision of Lot 9,] are to encompass long, broad, far reaching "ribbons" of forested buffer that are deed restricted, which raises maintenance concerns for said deed restricted areas[.]

. . . .

Based on the Delaware County Planning Commission's May 21, 1998 review, there seems to be a strong indication

19

that this property[, *i.e.*, Lot 9] was intended for preservation[.]

*Id.* at 1695a-97a.[12]

**F.**

On October 11, 2016, the Township filed suit against Appellees in the Trial Court. Therein, the Township sought an injunction to prevent Goshen Holding and Holloway from developing Lot 9 in conformance with Goshen Holding's June 3, 2016 preliminary plan. Township's Complaint, Count I Wherefore Clause. In addition, the Township requested a declaratory judgment "that the 1998 Record Plan note on the Montparnasse subdivision designating Lot #9 of Open Space be confirmed as a non-buildable lot of record." *Id.*, ¶31.

On October 24, 2016, the Township's Board of Commissioners passed Resolution 2016-110. Through this resolution, the Board of Commissioners denied Goshen Holding's June 3, 2016 preliminary plan application, on the basis that the proposed preliminary plan did not comply with multiple sections of the Township's Zoning Ordinance, including the Zoning Ordinance's prohibition on development of areas designated as open space. R.R. at 1711a-12a.[13] The Rosenblums, record owners of 800 Montparnasse Place, subsequently filed a Petition to Intervene, which the Trial Court granted on September 11, 2017. Trial Ct. Decision, F.F., ¶7.

The Trial Court then held a non-jury trial that took place over four days in late November 2018, and a single day in mid-January 2019. During the course of this trial, Holloway acknowledged that he had not paid the University an extra $85,000 for Lot 9 in 1998, but explained this was because there were only "8 buildable lots

---

[12] The letter also stated that the preliminary plan did not appear to fully comply with the Township's SALDO or Zoning Ordinance. R.R. at 1696a.

[13] It appears that Appellees appealed this denial of their preliminary plan to the Trial Court, but that land use appeal is not currently before us.

20

that could have permits pulled on them at the time. . . . Lot 9 . . . was not buildable or accessible at the time." N.T., 11/26/18, at 30-31. Holloway also admitted that Lot 9 was notated as "Open Space" on the preliminary plan that had been submitted to the Township in 1998. *Id.* at 34-35. However, Holloway maintained that he had never intended to preclude development of Lot 9 and, in his opinion, the "Open Space" notation did not create a permanent deed restriction. *Id.* at 81-88. Holloway also claimed that his "totally preserved" comment at the March 19, 1998 ZHB hearing only related to the carriage drive trail, not the entirety of Lot 9, although he admitted he never told the ZHB that he was keeping his options open as far as developing Lot 9. *Id.* at 130-31. To that end, Holloway testified, "I said we were proposing open space. That's what I knew at the time." *Id.*

Holloway was asked why he had sought to obtain a letter from Eugene Evans, the Township's then-solicitor, in 1998 that stated Lot 9 was buildable. Holloway replied, "Because I was about ready to close on one of the largest deals I've done in my being in business and it was important to me to make sure that there wasn't anything on those plans that we were recording that would preclude me from doing whatever we needed to do in the future for Lot 9." *Id.* at 83. Holloway explained that the only way to extract value from Lot 9 at the time was to have it deemed a buildable lot, even with the access issues that had been present prior to PennDOT's straightening of Goshen Road; a non-buildable lot, or one with a deed restriction, would be not be suitable for a conservation easement, because Goshen Holding would not be giving up an asset that was worth anything. *Id.* at 202-03.

Holloway was confronted with the Montparnasse marketing booklet, which described the site as containing "more than 9 acres of preservation space[,]" and was asked whether he ever told any of the prospective homebuyers that this space could

21

eventually be developed. *Id.* at 215. Holloway responded that he had, but only to those who had specifically asked him that question, and maintained that the "recorded Declaration[, which was provided to prospective buyers through the title report,] described the entire[ty of] what we could do with Lot 9." *Id.* at 215-16, 218-19.

As far as the amendment, in 2005, of the Declaration and Declaration Plat, Holloway said that he, as Goshen Holding's principal, had been vested with the power under the Declaration to unilaterally make such amendments without the input or approval of the other Association members. However, he felt it was the right move to involve them in the process of removing the "Open Space" notation that was on the 1998 final plan for Montparnasse and claimed that this notation "had no meaning other than it created questions and ambiguity in everybody's mind." *Id.* at 135-38. Holloway felt it was a fair trade to give up more than two acres of Lot 9 for use as a buffer area for Montparnasse and to restrict vehicular traffic on the carriage drive trail, in exchange for deleting the "Open Space" notation from the 1998 final plan and such things as the owner of Lot 9 being absolved of responsibility for assessments relating to storm water management around the cul-de-sac. *Id.* at 142-43.

Holloway admitted that he neither notified the owners of nearby properties regarding the proposed 2005 amendments to the Declaration and Declaration Plat, other than those who were members of the Montparnasse Homeowners Association, nor submitted the amended Declaration Plat to either the Township Planning Commission or Delaware County Planning Commission for review. *Id.* at 145-53. Instead, Holloway said he had gone to the Delaware County Planning Commission on February 17, 2005, and had given the amended Declaration Plat directly to a staff

22

employee named Jim Long, who reviewed it for about 45 minutes, before stamping the Plat with the signature of John E. Pickett, the then-Director of the Delaware County Planning Commission, and adding his initials "J.L." *Id.* at 152-57; *see* R.R. at 1403a. The Delaware County Planning Commission's stamped seal was a necessary prerequisite for the amended Declaration Plat to be recorded by the Delaware County Recorder of Deeds, which Holloway also accomplished on February 17, 2005. N.T., 11/26/18, at 157; *see* R.R. at 1403a.

In addition, Holloway stated that he has relied on the Board of Commissioners' 2005 passage of Resolution 2005-02 and the consequent removal of the "Open Space" notation from the 1998 final plan. N.T., 11/29/18, at 11-27. According to Holloway, this reliance has prompted him to continue to pay taxes to the Township for Lot 9, as well as to use Lot 9 as collateral for various loans relating to development of Montparnasse. *Id.*

Peter Clauss, owner of a property abutting Montparnasse, testified that Holloway had visited his home in 1998 to discuss the then-pending development plans and had intimated that Lot 9 would remain as open space:

> Lot [9] was a big concern to me[, *i.e.*, Clauss]. I had tried to buy some of what is now [L]ot [9] from Mr. Norris. I sent my real estate agent a year or two after [my wife and I had] bought the property in early 1967 to see if he would sell me some of the land abutting my eastern border. And the reason I wanted to do that [is because] my lot is shaped the same as the head of a hatchet. So you have a triangular section and then a narrow neck and then another -- and the house is in the narrowest part. So I wanted to in effect straighten the line between the two points of the hatchet analogy for protection. And Mr. Norris apparently had no interest in selling. So in the meeting with Mr. Holloway he indicated that he was going to preserve that land as well as the strip of land above me below the new houses he was building and give it to one of the nature conservancies. The only name I remember -- and this was not that it was

23

definitive but he said he still was trying to decide which outfit to give it to. But he said it would be like the Brandywine Conversancy. . . . And in effect he requested very politely and very indirectly that I not oppose the first phase of his development where he would build the seven or eight houses. So there was at least the suggestion of a quid pro quo that I not object to his building those houses and in return [Lot 9] was going to be open space.

N.T., 11/27/18, at 15-16.

Dennis DeRosa, former Manager of the Delaware County Planning Commission's Plan and Ordinance Review Department,[14] stated that he had written the Delaware County Planning Commission's review letters in 1998 regarding the subdivision plans for Montparnasse and had no doubt at that point that Lot 9 "was to be retained as an open space lot." *Id.* at 36. DeRosa recalled that neither Holloway nor anyone on Holloway's behalf informed DeRosa during the 1998 review process that Holloway intended to build on Lot 9 at some point, nor did DeRosa hear Holloway say anything to that effect at any of the contemporaneous Delaware County Planning Commission hearings. *Id.* at 44.

In addition, DeRosa mentioned that Holloway never filed the 2005 amended Declaration Plat with the Delaware County Planning Commission, as it was not in the Delaware County Planning Commission's file for Montparnasse. *Id.* at 49-51. Neither Long nor Holloway ever told DeRosa that Long had stamped the 2005 amended Declaration Plat. *Id.* at 52-53. DeRosa stated that he "[thought Long] was a bit lax in doing his job and the proper procedure [and had] more or less [done Holloway] a favor." *Id.* at 51. DeRosa also implied that Long and Holloway had some sort of relationship, as they went to the same church and Long "used to talk about his admiration for Mr. Holloway." *Id.* at 52. DeRosa admitted that Long did

---

[14] DeRosa worked for the Delaware County Planning Commission in various capacities between October 1987 and November 2018. N.T., 11/27/18, at 27-28.

24

have discretion to decide whether post-final approval changes to a subdivision plan were non-substantive, which would not require re-review by the Delaware County Planning Commission, or substantive, which would necessitate such review. *Id.* at 74-76. Even so, DeRosa believed that Long should have come to him in 2005 about the amendment that Holloway was proposing to make to the Declaration Plat, as DeRosa disagreed with Long's implicit determination that changes made, which affected the 1998 final plan, were not substantive. *Id.* at 84-86. In DeRosa's opinion, these changes were substantive **"[b]ecause the [approved 1998 final subdivision] plan had a major component of open space to satisfy eight homeowners. And the removal of that seven years after the fact constituted a significant change requiring re-review."** *Id.* at 120 (emphasis added).

Andrew Pancost, current Township Code Official, and former Project Manager and Vice President of Construction for the CFH Company, discussed his involvement with the Montparnasse development project. Pancost testified that he had worked at the Montparnasse site during the home construction phase in 1999 and that it was his understanding that "Lot [9] was open space. It was not to be built on." *Id.* at 138. Pancost believed this because Holloway "said that [Lot 9] was open -- it was to be left open[,]" and recalled communicating this belief to unidentified potential buyers and property owners at the time. *Id.* at 138, 140. On cross-examination, Pancost clarified that his belief that Lot 9 was to remain undeveloped open space was not based upon anything said by Holloway to him; rather, it was due to the "Open Space" notation on the 1998 final plan and the known physical characteristics of the area that impeded access to Lot 9. *Id.* at 143-45.[15]

---

[15] Daniel Meier, a former employee of Chester Valley Engineering, a company which assisted with designing the subdivision plans for Montparnasse in 1998, also testified. Meier did **(Footnote continued on next page…)**

25

Jeffrey Rosenblum testified that he had believed development of Lot 9 was restricted because of "the plan, the written materials, the marketing materials and the conversations with the owner of the property . . . [as well as] the fact that there was nothing else showing that there was future plans to develop." *Id.* at 285. According to Mr. Rosenblum, Holloway had "[c]onsistently noted [that Lot 9 would] either [be] given to the [Montparnasse Homeowners Association], given to the [Brandywine] Conservancy or deeded to the Township[,]" and had never mentioned, presale, that he retained the ability to build upon Lot 9. *Id.* at 170-71. Mr. Rosenblum admitted on cross-examination that he could not point to any specific language in the agreement of sale for his property that would act as a restrictive covenant preventing development of Lot 9. *Id.* at 223-25. He also acknowledged that he understood paragraph 23 of the agreement of sale, which limited the agreement's terms to the language used in the agreement itself and excluded any outside promises, conditions, *et cetera* from being part of the bargain. *Id.* at 226-28. Furthermore, Mr. Rosenblum recognized that Holloway's talk about deeding Lot 9 to a preservation organization, the Township, or the Montparnasse Homeowners Association were all prospective comments, not statements about actions that were guaranteed to occur. *Id.* at 240. While Holloway never told Mr. Rosenblum that he had placed a restrictive covenant on Lot 9 as a condition for Township approval of the 1998 subdivision plans, Mr. Rosenblum interpreted the final plan's approval as having been conditioned in part on Holloway agreeing never to develop Lot 9. *Id.* at 240-42.

---

not provide much information of substance, however, as he could not recall whether Holloway had ever expressed an intent to build upon Lot 9, nor could he recall why Lot 9 had been notated as open space on these plans, or whether Holloway had directed Lot 9 to be notated as such. N.T., 11/26/18, at 106-27.

Mr. Rosenblum also expressed his opinion regarding the Montparnasse Homeowners Association's decision in 2005 to approve Goshen Holding's proposed amendments to the Declaration and Declaration Plat. According to Mr. Rosenblum, Holloway effectively used the 1998 letter from former Township Solicitor Evans as leverage against the other Association members, in order to get their assent for removing the "Open Space" notation from the 1998 final plan. Essentially, in Mr. Rosenblum's telling, the Association's members took the deal offered by Holloway, because they were concerned Holloway would otherwise just elect to develop Lot 9 as he saw fit, in line with the 1998 Evans Letter's statement that Lot 9 was buildable. *Id.* at 270-74.

Kevin Kochanski, the Township's Director of Community Development and its Zoning Officer, testified about his decision in 2012 to deny Goshen Holding's grading permit application for Lot 9. Kochanski noted that Goshen Holding's 1998 final subdivision plan "was the only recorded subdivision plan [for Montparnasse] on record at the Township and at the County." N.T., 11/28/18, at 7-8. Kochanski had noticed correspondence in the Township's file regarding Holloway's 2005 actions, including that Holloway "had amended the [Montparnasse Homeowners Association] documentation and had recorded a plan regarding [its] covenants[,]" but did not factor in this amendment to his decision to deny the grading permit. *Id.* at 8-9. Instead, Kochanski concluded that the 2005 amendment to the Declaration Plat was a nullity as far as its effect upon the 1998 final plan for Montparnasse, because "whether it's recorded or not, the [amended Declaration Plat] is a declaration for a homeowner's association documentation and has no bearing or impact on a recorded subdivision plan." *Id.* at 33-37. For that reason, Kochanski deemed the Board of Commissioners' intent in passing Resolution 2005-02 to be

27

irrelevant as far as whether to grant Goshen Holding's 2012 grading permit application. *Id.* at 43-47.

Hubley, who was the Township Engineer between 1969 and October 2001, testified that he believed Lot 9 was not buildable in 1998, and that Holloway had no intent to build on it at that point, as the final plan for Montparnasse in 1998 lacked setback lines for Lot 9. *Id.* at 105. In addition, Hubley noted that the 1998 final plan showed eight buildable lots and one open space lot; according to Hubley, if Holloway wanted to remove the open space designation, he would have had to go through the whole review process again for a revised final subdivision plan. *Id.* at 110-12, 115-16. Hubley also acknowledged that, at the time, the Township's SALDO required specific language on a subdivision plan declaring a section of land to be "open space" that was ineligible for further development or subdivision;[16] however, he did not mandate the use of this language and, to his knowledge, it was never used in practice to denote preserved open space on such subdivision plans. *Id.* at 119-20, 134-35.

Leonor Rosenblum testified that Holloway told her during the sale process for her property that Lot 9 would "inevitably [be] open space . . . [and] that he was going to [either] deed it to the Township, deed it to the homeowner[]s, or keep it for himself

---

[16] In 1998, Section 255-43(B) of the Township's SALDO read, in relevant part:

> Open Space Designation. All lands held for open space shall be so designated on the plans. The plans shall contain the following statement for lands in Subsection B(1) [(Lawn)], (2) [(Natural Area)] or (3) [(Recreation area)] below: "Open space land may not be separately sold, nor shall such land be further developed or subdivided." All subdivision plans shall further designate the use of open space, the type of maintenance to be provided and a planting plan or schedule.

Township SALDO § 255-43(B); R.R. at 1041a-42a.

to preserve for the conservancy." *Id.* at 151. Mrs. Rosenblum was then impeached with her deposition statement, where she said Holloway spoke of only two ways he might dispose of Lot 9: "[E]ither he would deed [it] to the Township or . . . keep it for himself." *Id.* at 152.

Harry Mahoney testified regarding his dealings with the Montparnasse development as a Board of Commissioners member in both 1998 and 2005. Mahoney interpreted the language of Resolution 98-11 as not placing a deed restriction on Lot 9, but still imposing a bar upon Lot 9's development, because this Resolution did not accord Lot 9 the status of buildable lot. *Id.* at 180-82. When he voted to approve the 1998 final plan for Montparnasse, Mahoney interpreted the notation "Open Space" as

> mean[ing] just that. [Lot 9] was to remain as open space, not developable, not buildable. And it was consistent with the resolution I believe that was approved by the Board [of Commissioners, *i.e.*, Resolution 98-11.] . . . And it certainly was consistent with the preamble of the homeowner's declaration which indicated it was going to be nine lots, eight of which were buildable.

*Id.* at 227-28. According to Mahoney, he only saw former Township Solicitor Evans' 1998 letter to Snyder during the 2005 Board of Commissioners' meetings regarding Holloway's effort to amend the Declaration Plat, but did not know about Snyder's initial 1998 letter to Evans "until this litigation started." *Id.* at 237-38. Mahoney stated that the Township solicitor **"does not have authority to bind the Board [of Commissioners] with regard to any subdivision plans[,]"** effectively rejecting the determinative value of the 1998 Evans letter regarding whether Lot 9 was a buildable lot. *Id.* at 172-77 (emphasis added). With regard to the 2005 proceedings, he agreed that one of the consequences of passing Resolution 2005-02 was to permit Holloway to use Lot 9 as a buildable lot. *Id.* at 189-90. However, he now disagreed with his

29

own 2005 vote in favor of allowing Holloway to amend the Declaration Plat, because Holloway had circumvented the proper review process and should have instead filed an application to amend Montparnasse's final plan. *Id.* at 182-83, 196-97.

Daniel Malloy, former Township Engineer, testified that it was his understanding that, prior to 2005, Lot 9 was not a buildable lot. *Id.* at 288-89. Malloy believed that Lot 9's status changed as a result of the Board of Commissioners' passage of Resolution 2005-02 and that, as a result, Lot 9 was buildable when Goshen Holding filed its grading permit application in 2011. *Id.* at 266. According to Malloy, he was "not so sure" that changing Lot 9 from open space to a buildable lot was a substantial enough revision to require submission of an application to amend Montparnasse's final plan, since this change did not affect the number of lots on the plan or alter its lot lines. *Id.* at 281-84. Malloy also stated that he had not treated the proposed amended Declaration Plat as a subdivision application. *Id.* at 289-95.

On the final day of the trial, Appellees sought to enter into evidence three final subdivision plans pertaining to other developments that had been approved by the Township in 1994 and 1996, *i.e.*, during Hubley's tenure as Township Engineer. These plans were offered to rebut Hubley's statement that, to his knowledge, approved Township subdivision plans never contained the language required by the Township's SALDO for preserving open space. N.T., 1/18/19, at 23-25. The Trial Court admitted these three plans into evidence, over the objections of both the Township and the Rosenblums, for the limited purpose of "not[ing] that on other

occasions on plans, there's actual language . . . from the [Township's SALDO regarding preservation of open space]." *Id.* at 40-41.[17]

## G.

On March 14, 2019, the Trial Court issued its Decision, finding in favor of Appellees. First, the Trial Court addressed what had taken place in 1998. The Trial Court concluded that "Holloway's unequivocal action of striking condition thirteen (13) from Resolution 98-11 and the Township's approval of the [Montparnasse] [f]inal plan without this condition indicates the mutual assent of the parties to not impose a restrictive covenant against future development on Lot Nine (9)." Decision, Conclusions of Law (C.L.), ¶9. As such, the Trial Court determined that Appellees and the Township had not agreed to place a *deed restriction/restrictive covenant of any sort* upon Lot 9 as a condition of Resolution 98-11's approval. According to the Trial Court, this interpretation was also supported by Evans' 1998 letter, which "[gave] further weight that at the time of the Final Plan approval, Lot Nine (9) was 'not restricted against further development' and that it was a 'buildable lot.'" *Id.*, ¶10. The Trial Court also deemed Holloway's failure to pay the University an extra $85,000 for Lot 9 to merely reflect that it was "[then] economically [in]feasible to develop the land[,]" not that Appellees never intended to build upon Lot 9. *Id.*, ¶12. Furthermore, the Trial Court noted the Township's SALDO mandated specific

---

[17] Appellees' attorney argued that he was allowed to use these plans as rebuttal evidence, even though he did not confront Hubley with them during the course of his trial testimony. In response, the Township's attorney pointed out that Hubley was both Appellees' witness and had made the same statement at his deposition, so Appellees could not reasonably claim they had not been on notice as to what Hubley would say. In addition, the Township's attorney highlighted that these plans were being submitted after Hubley testified, so there was no opportunity for him to clarify his trial statements, and maintained that admitting them without providing any contextual information risked drawing inaccurate assumptions about why the SALDO-mandated open space language was used in these plans. N.T., 1/18/19, at 23-40.

31

language for an area to be formally designated as undevelopable open space, and reasoned that the "Open Space" notation, without this required language, could not be viewed as a bar against developing Lot 9. *Id.*, ¶¶15-17. In short, the Trial Court viewed the "Open Space" notation on the 1998 final plan not as a deed restriction or restrictive covenant of some sort, but rather as a contemporaneous statement by Appellees that they did not intend to build anything on Lot 9 at that time. *Id.*, ¶¶13-14.

Moving on to what had taken place in 2005, the Trial Court concluded that Appellees had not been required under the Township's SALDO to submit an amended subdivision plan for review at that time. *Id.*, ¶¶18-21. The Trial Court also determined that it had been the Township's responsibility to decide whether Holloway was conducting his effort to amend Montparnasse's Final Plan in a procedurally proper manner. *Id.*, ¶¶22-24. While recognizing that Holloway did not follow "the strict letter of procedure[,]" the Trial Court faulted the Township for not identifying such defects in a timely fashion and stated that "the burden of that failure . . . is not [Appellees'] to bear." *Id.*, ¶¶25-26. In addition, the Trial Court ruled that the Township's challenge to the validity of Resolution 2005-02 was untimely, as the Township was statutorily required by the MPC to do so within 30 days of the Resolution's passage. *Id.*, ¶¶27-29. Furthermore, the Trial Court held that because Appellees had relied in good faith upon the validity of Resolution 2005-02, per the MPC, they could not now be stripped of the property rights they had accrued through passage of this Resolution. *Id.*, ¶¶30-33.

Lastly, the Trial Court addressed the Rosenblums' claims. Noting that the Rosenblums were merely intervenors in the Township's lawsuit, the Trial Court concluded, by law, they were limited to raising the substantive claims that had been

originally asserted by the Township and could not seek relief on any alternative basis. *Id.*, ¶¶34-39. Thus, the Rosenblums could not raise any issues other than the restrictive covenant argument that had been made by the Township. *Id.*, ¶40. Furthermore, the Trial Court concluded that the Rosenblums' arguments resting upon representations Appellees allegedly made to them prior to the Rosenblums' purchase of 800 Montparnasse Drive were without merit for three reasons: first, any such representations were expressly disclaimed through the agreement of sale and buyer's acceptance that were signed by the Rosenblums; second, Mrs. Rosenblum admitted that Holloway had told her he might elect to keep Lot 9 for himself; and third, Evans' 1998 letter, in which Evans stated that Lot 9 is a buildable lot and "is not restricted against further development either by [T]ownship ordinance or by any requirement of [T]ownship approval[,]" was in the Township's file for Montparnasse and should have been discovered by the Rosenblums, as they had directed their attorney to review the file prior to the Rosenblums' decision to sign the agreement of sale. *Id.*, ¶¶41-42.

Both the Township and the Rosenblums subsequently filed separate post-trial motions, which the Trial Court denied on July 22, 2019. These appeals followed. The Township and the Rosenblums then presented the Trial Court with Concise Statements of Errors Complained of on Appeal, to which the Trial Court responded by issuing a short opinion on October 9, 2019, which incorporated the previously-issued Decision by reference.

## II. Standard of Review

> When reviewing a non-jury verdict, our standard of review is limited to determining whether the competent evidence supports the trial court's findings of fact and whether the trial court committed an error of law. *James Corporation v. North Allegheny School District*, 938 A.2d 474, 483 n.6 (Pa. Cmwlth. 2007). This Court must treat the trial court's

33

findings of fact the same as this Court would treat a jury's findings of fact. *Id.* This Court views the evidence in the light most favorable to the party that prevailed before the trial court. *Id.*

*E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist.*, 111 A.3d 220, 226 (Pa. Cmwlth. 2015). "[W]hen deciding issues of law[,] an appellate court is not required to defer to the conclusions of a trial court. . . . This is consistent with the fact that for questions of law, an appellate court's standard of review is *de novo* and its scope of review is plenary." *Dolan v. Hurd Millwork Co.*, 195 A.3d 169, 176 (Pa. 2018) (internal citation omitted).

### III. Issues on Appeal

The Township raises the following issues for our consideration, which we have summarized and reorganized for clarity's sake.[18] First, the Trial Court erred and

---

[18] The Rosenblums' arguments, other than those that overlap with the ones made by the Township, center mainly upon what claims they were permitted to raise as intervenors and the Trial Court's interpretation of Mrs. Rosenblum's testimony. We address these additional arguments briefly: As a matter of law, the Trial Court erred in concluding that the Pennsylvania Rules of Civil Procedure bar an intervenor from raising claims beyond those raised by the plaintiff. Pa. R.C.P. No. 2329 establishes that a trial court may deny a petition to intervene when:

> (1) the claim or defense of the petitioner is not in subordination to and in recognition of the propriety of the action; or
>
> (2) the interest of the petitioner is already adequately represented; or
>
> (3) the petitioner has unduly delayed in making application for intervention or the intervention will unduly delay, embarrass or prejudice the trial or the adjudication of the rights of the parties.

"A trial court's determination of whether an application for intervention may be denied pursuant to Pa. R.C.P. No. 2329 is discretionary." *Twp. of Radnor v. Radnor Recreational, LLC*, 859 A.2d 1, 5 (Pa. Cmwlth. 2004). Here, the Trial Court granted the Rosenblums' Petition to Intervene and did not place any conditions upon their intervention. The Trial Court thus erred by ruling that the Rosenblums could not raise claims beyond those articulated by the Township.

However, this is more of an academic point for two reasons. First, the Rosenblums maintain that they did not seek to raise any additional claims and merely wished to enforce the putative deed restriction/restrictive covenant on Lot 9 that was allegedly created via the 1998 final plan. *See* **(Footnote continued on next page…)**

abused its discretion by determining that the "Open Space" notation on the Montparnasse final subdivision plan that Appellees recorded in 1998 did not constitute an enforceable restrictive covenant barring future development or subdivision. Township's Br. at 19-28. According to the Township, "the plain language, nature of the subject matter, as well as the object of the parties, and conditions surrounding it, as well as the evidence adduced at trial, all unequivocally demonstrate that the term 'open space' depicted on the 1998 [final] [p]lan constitutes an enforceable, restrictive covenant." *Id.* at 20-21. Second, the Trial Court erred and abused its discretion by allowing Appellees' counsel to enter into evidence the three aforementioned subdivision plans from 1994 and 1996 pertaining to other developments.[19] *Id.* at 25-26. Third, the Trial Court erred and abused its discretion by determining that the 2005 amended Declaration Plat constituted a legally proper revision of the 1998 final plan under the MPC. *Id.* at 28-31. The Township claims this is the case because the Board of Commissioners only approved an amendment to the Declaration and Declaration Plat, rather than an amendment to the 1998 final plan. *Id.* Fourth, to the extent Appellees considered the Board of Commissioners' approval of Resolution 2005-02 to be a land use decision, this Resolution was void

---

Rosenblums' Br. at 23-26. Second, the Rosenblums' agreement of sale for 800 Montparnasse Drive expressly limited the terms of the agreement to what was specifically mentioned in that document, and disclaimed as not being part of the bargain any other statements or representations that may have been made. *See* R.R. at 1363a. Thus, what Holloway or his associates may have said to the Rosenblums prior to consummating this sale is entirely irrelevant and it is immaterial whether the Trial Court correctly construed Mrs. Rosenblum's testimony regarding what Holloway told her about Lot 9.

[19] As previously mentioned, these plans were admitted for use as rebuttal evidence against Hubley's testimony that the SALDO-mandated language regarding open space preservation was never, in his recollection, actually used on any such plans. To reiterate, Hubley was the Township Engineer between 1969 and October 2001 and was extensively involved with reviewing the subdivision plans for Montparnasse in 1998.

*ab initio*. *Id.* at 31-35. The Township claims this is so because Appellees failed to give proper notice to nearby property owners, there was no public hearing, and Appellees' conduct "was designed to preempt any meaningful input by adjacent property owners[.]" *Id.* Fifth, the Trial Court erred in ruling that the Township's challenge to Resolution 2005-02 was untimely pursuant to the MPC. *Id.* at 35-42. Resolution 2005-02 was neither a land use decision nor an adjudication because it only approved an amendment to the Declaration and Declaration Plat and did not address a formal, filed subdivision plan application. *Id.* Therefore, the MPC does not bar the Township from attacking Resolution 2005-02's validity at this juncture. *Id.* Sixth, the Trial Court erred in concluding that Appellees relied in good faith on the approval of Resolution 2005-02, because Holloway intentionally failed to follow proper procedure in seeking to amend the 1998 final plan. *Id.* at 42-43. Finally, Appellees are barred by equitable estoppel from developing Lot 9, as "Holloway's actions unequivocally demonstrate that he intentionally and repeatedly misrepresented that Lot 9 would remain open space." *Id.* at 43-46.

Appellees' responsive arguments essentially boil down to a full defense of the Trial Court's Decision, through which Appellees maintain that the Trial Court neither abused its discretion nor committed errors of law. *See* Appellees' Br. at 33-51, 54-58. Of note is Appellees' claim that the *Township* is equitably estopped from asserting that a restrictive covenant bars development of Lot 9. *Id.* at 51-54. As discussed at length *infra*, the Trial Court's failure to address this claim compels in part our disposition of these appeals.

## IV. Discussion and Analysis

In light of the numerous issues raised by the parties in these combined appeals, it is more effective from an analytical standpoint to divide them into three categories.

36

First, we will address the issues that pertain directly to the 1998 final plan for Montparnasse. Next, we will address the issues that pertain directly to the 2005 amendments to the Declaration and Declaration Plat, which were approved by both the Montparnasse Homeowners Association and the Township's Board of Commissioners. Finally, we will address the broader question of whether any of the parties may invoke the doctrine of equitable estoppel under the circumstances in order to obtain judgment in their favor.

## A. 1998 Montparnasse Final Plan

In a nutshell, the Township's and the Rosenblums' arguments regarding the original 1998 final plan for Montparnasse all focus upon their belief that the Trial Court erred and abused its discretion by concluding that this plan did not, and does not, restrict Lot 9's development. The notation of "Open Space" for Lot 9, which is contained in all of the subdivision plans for Montparnasse that were submitted by Goshen Holding in 1998, is at the heart of this dispute.

Here, the exact import of the "Open Space" notation is ambiguous, as it is unclear on its face whether it meant that Lot 9 would be preserved in perpetuity via some sort of deed restriction or restrictive covenant,[20] or, as Appellees now argue,

---

[20]    A restrictive covenant is a restriction in an instrument relating to real estate by which the parties pledge that something will not be done. Black's Law Dictionary [329, 1182 (]5th ed[.] 1979[)]. Restrictive covenants have limited the use of property, *Rieck v.* [*Va.*] *Manor Co.*, . . . 380 A.2d 375 ([(Pa. Super.)] 1977), have restricted access to certain roads, *Bonner* [*v. Upper Makefield Twp.*, 597 A.2d 196 (Pa. Cmwlth. 1991)], and have imposed limits on re-subdivision, *Ballard v. Heppe*, . . . 589 A.2d 266 [(Pa. Super.)], *appeal denied*, . . . 600 A.2d 950 ([Pa.] 1991). Such covenants are "said to run with the land, when not only the original parties or their representatives, but each successive owner of the land, will be entitled to its benefit, or be liable (as the case may be) to its obligation." Black's Law

**(Footnote continued on next page…)**

37

merely indicates that they did not intend to build upon Lot 9 at the time those plans were under consideration. Given this ambiguity, the Trial Court properly considered additional evidence outside the bounds of the recorded 1998 final plan, so that the Lot 9 "Open Space" notation could be placed in the proper context and have its true meaning ascertained.

> [I]t is well settled in Pennsylvania law that in the absence of fraud, accident or mistake, parol evidence as to preliminary negotiations or oral agreements is not admissible in evidence if it adds to, modifies, contradicts or conflicts with the written agreement between the parties. . . . However, it is equally well settled that this general rule does not apply where the agreement is ambiguous. In such a situation[,] parol evidence is admissible to explain the agreement and resolve ambiguities to ascertain the meaning of the parties.

*Daset Mining Corp. v. Indus. Fuels Corp.*, 473 A.2d 584, 592 (Pa. Super. 1984) (internal citations omitted). "Where a[n] . . . agreement . . . is obscure or ambiguous, the intention of the parties is to be ascertained in each instance not only from the language of the entire written instrument there in question, but also from a consideration of the subject matter and of the surrounding circumstances." *Com. v. Fitzmartin*, 102 A.2d 893, 894 (Pa. 1954).

Even so, the Trial Court's conclusion that the 1998 final plan did not preserve Lot 9 as undevelopable open space via a deed restriction or restrictive covenant

---

Dictionary [329 (]5th ed[.] 1979[)]. Although restrictive covenants are not favored by the law and are strictly construed against those seeking to enforce them, they are legally enforceable. Restrictive covenants are construed in light of the subject matter, the intent or purpose of the parties and the conditions surrounding execution of the covenant, *Gey* [*v. Beck*, 568 A.2d 672 (Pa. Super. 1990)], and conditions contained in a recorded subdivision plan are enforceable even if the conditions are not specifically set forth in the deeds conveying the lots created by the subdivision, *Ballard*.

*Doylestown Twp. v. Teeling*, 635 A.2d 657, 661 (Pa. Cmwlth. 1993).

constitutes an abuse of discretion and an error of law. Given that understanding the meaning of the "Open Space" notation involves both interpretation of the Township's SALDO and consideration of evidence adduced at trial, this is a mixed question of law and fact.

> The standard for reviewing mixed questions of law and fact is not settled in Pennsylvania . . . . The answer to this question must be evaluated on an issue-by-issue basis, since some mixed questions are more heavily weighted toward fact, while others are more heavily weighted towards law. . . . The more fact intensive a determination is, the more deference a reviewing court should give the conclusion below.

*Com. v. Crawley*, 924 A.2d 612, 615-16 (Pa. 2007) (internal citations omitted). As the Trial Court notes, the 1998 final plan does not contain some of the specific open space language required by the Township's SALDO. At the time this final plan was approved and recorded, Section 255-43(B) of the Township's SALDO read, in relevant part:

> Open Space Designation. All lands held for open space shall be so designated on the plans. The plans **shall** contain the following statement for lands in Subsection B(1) [(Lawn)], (2) [(Natural Area)] or (3) [(Recreation area)] below: "Open space land may not be separately sold, nor shall such land be further developed or subdivided." All subdivision plans shall further designate the use of open space, the type of maintenance to be provided and a planting plan or schedule.

Township SALDO § 255-43(B) (emphasis added); R.R. at 1041a-42a. The import of the word "shall" is key.

> "The word 'shall' ... can be interpreted as mandatory or merely directory." *Francis v. Corleto*, . . . 211 A.2d 503, 509 ([Pa.] 1965). A court must "look to the intention and purpose of the statute in determining whether the word *shall* is to be given a permissive or imperative meaning." *Division 85, Amalgamated Transit Union v. Port Auth. of*

> *Allegheny Cnty.*, . . . 208 A.2d 271, 272 ([Pa.] 1965)
> (emphasis in original).

*In re Sale of Real Estate by Lackawanna Cty. Tax Claim Bureau*, 22 A.3d 308, 314

(Pa. Cmwlth. 2011).

> To hold that a statutorily prescribed procedure is directory does not mean that it is optional; to be adhered to or not at will. . . . The distinction between a mandatory and a directory statute lies in the effect of noncompliance upon the transaction involved—not in the liability of the person who has violated the statute. Failure to conform to a mandatory procedure renders the regulated activity a nullity. Strict compliance with a directory provision, on the other hand, is not essential to the validity of the transaction or proceeding involved.

*Fishkin v. Hi-Acres, Inc.*, 341 A.2d 95, 99 (Pa. 1975) (internal citation omitted).

While Lot 9 is marked as "Open Space" on the recorded 1998 final plan, there is no statement thereon that "[o]pen space land may not be separately sold, nor shall such land be further developed or subdivided[,]" as required by the Township's SALDO § 255-43(B). However, this omission is not dispositive, given the evidence presented at trial on this issue. For example, Hubley testified that he could not recall the required SALDO language ever being used on subdivision plans during his tenure as Township Engineer. Yet, the Trial Court admitted into evidence three unrelated subdivision plans, for the "limited purpose of "not[ing] that on other occasions on plans, there's actual language . . . from the [Township's SALDO regarding preservation of open space]." N.T., 1/18/19, at 40-41. Furthermore, the Township's SALDO does not state that the absence of this required language automatically renders an area buildable. This, coupled with the Township's inconsistent adherence to Section 255-43(B)'s requirements establishes that, at least during Hubley's time, the word "shall" in this section was directory, not mandatory. For this reason, the absence from the recorded 1998 final plan of the SALDO-

required statement does not establish on its own that Lot 9 was not meant to be preserved as open space via a deed restriction or restrictive covenant.

Furthermore, the Trial Court's conclusion that the "Open Space" notation on the recorded 1998 final plan placed no restrictions on Lot 9's development is not supported by the record. The Trial Court cites as dispositive "Holloway's unequivocal action of striking [proposed] condition thirteen (13) [("That Lot #9 be deed restricted with a conservation easement")] from Resolution 98-11 and the Township's approval of the [Montparnasse] [f]inal plan without this condition[.]" Decision, C.L., ¶9. The Trial Court stated that this "indicates the mutual assent of the parties to not impose a restrictive covenant against future development on Lot Nine (9)." *Id.*

However, the Trial Court's conclusion is simply not supported by the record. Throughout the governmental review process in 1998 for the Montparnasse subdivision plans, Holloway and his representatives appeared before the Township's Board of Commissioners, Planning Commission, and ZHB, and **repeatedly**, **consistently, and unambiguously** stated that Lot 9 would be deeded to a private land conservation organization, the Township, or the Montparnasse Homeowners Association. There was not a single mention by Holloway or his representatives during the 1998 governmental review process of an intent to build upon Lot 9 at some future point. Furthermore, there was a consistent distinction made by Holloway, his representatives, and the various governmental entities between Lots 1 through 8, which were deemed throughout the 1998 governmental review process to be buildable lots, and Lot 9, which was deemed throughout the same process to be an open space lot.

41

In addition, the Trial Court failed to recognize that a conservation easement is by no means the **only** way to restrict a property's development. A deed restriction or restrictive covenant "is a restriction in an instrument relating to real estate by which the parties pledge that something will not be done." *Teeling*, 635 A.2d at 661 (quoting Black's Law Dictionary 329, 1182 (5th ed. 1979)). A "conservation easement is designed to preserve servient land in [an] undeveloped or natural state." *Ephrata Area Sch. Dist. v. Cty. of Lancaster*, 886 A.2d 1169, 1175 (Pa. Cmwlth. 2005), *rev'd on other grounds*, 938 A.2d 264 (Pa. 2007) (citing Vivian Quinn, *Preserving Farmland with Conservation Easements: Public Benefit or Burden?*, 1992/1993 Ann. Surv. Am. L. 235, 238). "[M]ost conservation and preservation servitudes are granted to governmental bodies, land trusts, or other charitable entities that engage in conservation or preservation activities[.]" Restatement (Third) of Property, Servitudes § 1.6 (Am. Law Inst. 2000). Thus, while a conservation easement is certainly a type of deed restriction or restrictive covenant, as it places limitations on land use, *these are not wholly interchangeable concepts*.

This is borne out by the plain language of Resolution 98-11's proposed condition 13, which, again, stated "[t]hat Lot #9 be deed restricted with a conservation easement[.]" On its face, this proposed condition makes clear that deed restriction, in this context, is a broad concept that subsumes preservation of land via conservation easement. What it *does not do*, however, is establish that Appellees disclaimed *all* manner of deed restrictions or restrictive covenants. Appellees could, in line with the statements they made during the 1998 governmental review process, simply deed Lot 9 to the Township or the Montparnasse Homeowners Association for market or nominal value, on the condition that Lot 9 remain as open space in perpetuity. Doing so would likely prevent Appellees from securing some of the

42

benefits of restricting Lot 9's development via conservation easement.[21] Even so, Holloway's striking of proposed condition 13 fails to show that the "Open Space" notation on the 1998 final plan did not constitute a deed restriction or restrictive covenant.

Similarly, the Trial Court also abused its discretion in concluding that former Township Solicitor Evans' 1998 letter helped establish that the "Open Space" notation on the 1998 final plan did not restrict Lot 9's development. To reiterate, Evans wrote in this letter:

> This is to confirm that even though the [final approved] subdivision plan [for Montparnasse] contains the words "open space" in relation to Lot 9, Lot 9 is in fact not restricted against further development either by [T]ownship ordinance or by any requirement of [T]ownship approval. **Lot 9 is a buildable lot subject to any [T]ownship review and approval for access, stormwater and compliance with all applicable building regulations.**

R.R. at 1318a (emphasis added). As noted earlier, Harry Mahoney, former president of the Township's Board of Commissioners, testified that the Township solicitor **"does not have authority to bind the Board [of Commissioners] with regard to any subdivision plans**[.]" N.T., 11/28/18, at 172-77 (emphasis added). In doing so, Mahoney effectively rejected the idea that Evans had the power to decide on his own that Lot 9 was a buildable lot. There is no evidence in the record that contradicts Mahoney's statement about the Township solicitor's powers. Furthermore, it is

---

[21] Snyder himself informed former Township Solicitor Evans in 1998 that Appellees, Snyder's clients, "intend[ed] to offer a Conservation Easement on [Lot 9] as a gift and thereafter maintain it as open space[,]" but that he "need[ed] a letter from the Township for use in the appraisal and tax audit of the charitable contribution of the Conservation Easement acknowledging that Lot 9 is not restricted as open space[.]" R.R. at 1252a. This statement shows that Appellees viewed a conservation easement as a way to extract tax relief as compensation for preserving Lot 9 as open space.

unclear how Evans' 1998 letter could possibly be correct, given that Resolution 98-11, *i.e.*, the Township legislation that formally approved the 1998 final plan, expressly stated: "[CFH Company had applied] to subdivide 21.858 acres into nine lots, eight of which are building lots at 800 Goshen Road[.]" R.R. at 1245a. Evans could not simply turn Lot 9 into a buildable lot on his own initiative, given that he had no power to contradict or override the Board of Commissioners. Thus, Evans' 1998 letter does not provide a basis for affirming the Trial Court's interpretation of the 1998 final plan's "Open Space" notation for Lot 9.

Ultimately, the only supportable conclusion, when construing this notation in the context of the record parol evidence, is that Appellees may have expressly rejected the requirement that they preserve Lot 9 via a ***conservation easement***, *but still were unambiguous and outspoken in their commitment to safeguarding Lot 9 through another form of deed restriction or restrictive covenant.* The Trial Court therefore erred and abused its discretion by concluding otherwise.

**B. 2005 Amended Declaration and Declaration Plat**

Next, the Township and the Rosenblums raise a number of arguments regarding Appellees' 2005 amendments to the Montparnasse Homeowners Association's Declaration and Declaration Plat, which were approved by the Board of Commissioners through Resolution 2005-02. As noted earlier, these amendments turned Lot 9 into a separate development, terminated its membership in the Montparnasse Homeowners Association, and eliminated the "Open Space" notation from the 1998 final plan. In essence, the Township and the Rosenblums argue that the Trial Court abused its discretion and committed errors of law by determining that Resolution 2005-02 was a valid land use decision or adjudication pursuant to the MPC. The Township further argues that it is not timed-barred from challenging the

validity of Resolution 2005-02 and asserts that Appellees did not rely in good faith upon this Resolution to form the belief that Lot 9 is buildable. Finally, assuming in the alternative that Resolution 2005-02 is a valid land use decision under the MPC, the Township and the Rosenblums argue that it is void *ab initio*, due to Appellees' failure to give proper advance notice to nearby property owners and the lack of a public hearing regarding the Resolution prior to its approval.

These arguments do not need to be resolved on their merits, however, due to Appellees' position on the practical effect of Resolution 2005-02's enactment. Appellees have consistently argued that Holloway's actions did not materially change the 1998 final plan, but instead merely confirmed what Appellees have argued was always true, namely, that Lot 9 was buildable. Appellees expressly claim in their appellate brief that

> the evidence at trial was overwhelming that the removal of the words "open space" was not intended to substantively change the 1998 [f]inal [p]lan. Rather it was intended to ***clarify*** the mutual intent of the Township['s] Board of Commissioners and Goshen [Holding] that Lot 9 was a buildable lot that could be developed in the future, as was confirmed by the removal of Condition 13 from Resolution 98-11, and by the [former Solicitor Evans'] letter to Goshen [Holding] on October 20, 1998, before the 1998 [f]inal [p]lan was filed of record by Mr. Holloway.

Appellees' Br. at 45 (emphasis in original). Furthermore, as Holloway himself testified before the Trial Court, the purpose of the 2005 amendment to the Declaration Plat "was to remove the words ["O]pen [S]pace[" from the 1998 final plan] . . . which [were] two words on the [1998 final] plan that had no meaning other than it created a question and ambiguity in everybody's mind." N.T., 11/26/18, at 136. Thus, Appellees argue that the Board of Commissioners' approval of Resolution 2005-02 had only a cosmetic effect on the 1998 final plan, rather than a

material one, as this approval did nothing more than remove the words "Open Space" from the 1998 final plan. Taking that argument to its logical conclusion, Resolution 2005-02 did not alter whether Lot 9 is either buildable, or had deed-based restrictions on its development, and imbued Appellees with no rights they did not already have prior to enactment of the Resolution.[22]

## C. Equitable Estoppel

Finally, both the Township and Appellees assert the doctrine of equitable estoppel, in dueling efforts to obtain judgment in their favor on account of each side's alleged reliance upon their opponent's putatively misleading acts and omissions. Generally, "the elements of [equitable] estoppel are 1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; 2) *unambiguous proof of reasonable reliance* upon the misrepresentation by the party asserting the estoppel; and 3) the lack of a duty to inquire on the party asserting the estoppel." *Chester Extended Care Ctr. v. Dep't of Pub. Welfare*, 586 A.2d 379, 382 (Pa. 1991) (emphasis added). In the context of land use matters, we have stated that a landowner can only invoke equitable estoppel by showing, in good faith, "1) that he relies to his detriment, *such as making substantial expenditures*, 2) *based upon an innocent belief that the use is permitted*, and 3) that enforcement of the [land use

---

[22] We also note that, contrary to the Trial Court's analysis, Resolution 2005-02 does not constitute an adjudication or land use decision for purposes of the MPC. This is because Holloway did not submit his proposed amendments to the Declaration and Declaration Plat in the form of an application for approval of a subdivision plan. Simply put, the MPC does not address a scenario where a homeowners association is required to obtain the assent of the local executive body for any amendments to its governing document. Nor does the MPC contemplate a homeowners association putting forth a proposed amendment that alters its previously approved subdivision plan. Therefore, the MPC's statutory time bar on challenging the validity of Resolution 2005-02 is inapplicable, as is the MPC's bar against stripping Appellees of any previously acquired property rights they had gained through good faith reliance on the Township. However, these points are essentially moot, because, again, Resolution 2005-02 had no substantive effect upon whether Lot 9 was, or is, buildable.

regulation] would result in hardship, *ordinarily that the value of the expenditures would be lost.*" *In re Kreider*, 808 A.2d 340, 343 (Pa. Cmwlth. 2002) (emphasis added). "[Equitable e]stoppel . . . is an unusual remedy granted only in extraordinary circumstances and the [party seeking to invoke it] bears the burden of proving [their] entitlement to [such] relief." *Id.*

Though the Trial Court did not address the Township's argument that Appellees should be equitably estopped from building upon Lot 9, we deem this error to be harmless because the Township's argument on this point is unsupported by the record. As already noted, Holloway told the Board of Commissioners in 2005 that he believed Lot 9 was buildable. Given that this flatly contradicted the 1998 final plan and marked a clear shift from how Holloway had previously talked about Lot 9, the Township had a corresponding duty to inquire further into the matter. Therefore, at minimum, the Township cannot meet the third prong of the equitable estoppel test.

We cannot reach the same conclusion at this point regarding Appellees' equitable estoppel argument, as the Township did at times give the impression that Lot 9 was not development-restricted. This can be seen through former Township Solicitor Evans' 1998 letter, which deemed Lot 9 buildable, and passage of Resolution 2005-02, which both removed the "Open Space" notation from the 1998 final plan and implicitly indicated that the Township considered Lot 9 to be buildable in 2005. Of course, these factual points are contradicted by Resolution 98-11's clear language establishing that Lot 9 was not a buildable lot, in addition to Evans' utter lack of authority to independently declare, without the Board of Commissioners' assent, that Lot 9 was buildable.

47

Our review is further complicated by the Trial Court's failure to specifically address whether equitable estoppel applied here in Appellees' favor. Instead, the Trial Court applied Section 1002.1-A(f) of the MPC,[23] which states: "An adjudication that a decision is void from inception shall not affect any previously acquired rights of property owners who have exercised good faith reliance on the validity of the decision prior to the determination." 53 P.S. § 11002.1-A(f). The Trial Court concluded that Appellees had relied in good faith upon the enactment of Resolution 2005-02 in four ways. First, Appellees "obtained financing based on the buildability of Lot [9.]" Decision, C.L., ¶32. Second, Appellees consistently paid property taxes to the Township over the years for Lot 9 "as if it was a developable lot[.]" *Id.* Third, Appellees "proceeded with engineering studies, permit applications, and other agreements as necessary to proceed with the development of Lot [9.]" *Id.* Finally, the Township did not notify Appellees of its belief that Resolution 2005-02 was invalid until years after PennDOT condemned part of Lot 9 in order to straighten Goshen Road. *Id.*, ¶33.

The Trial Court's analysis, however, is legally incorrect. As discussed earlier, the MPC is entirely inapplicable here, because Resolution 2005-02, which merely approved amendments to the Declaration and Declaration Plat, *is not a land use decision or an adjudication*. As such, the MPC's statutory protection of improvidently granted property rights that were acquired in good faith does not apply.

Furthermore, the "facts" referenced by the Trial Court do not clearly support invoking equitable estoppel in Appellees' favor. Holloway testified that Lot 9 was used as loan collateral with the assumption that it was buildable. *See* N.T., 11/29/18,

---

[23] *Added by* Act of July 4, 2008, P.L. 319.

at 11-12, 18-27. However, there is no evidence or testimony regarding the appraisal process for each loan, nor is there proof in the record that the terms of each loan would have been materially different in the event Lot 9 was not buildable. Also, while Appellees claim that they have paid property taxes on Lot 9 as if it was a buildable lot, *see* Appellees' Br. at 53, this argument is not substantiated by the record as currently constituted. Indeed, the tax documents in the record do not facially establish that Lot 9's property taxes were tied to whether Lot 9 was buildable, *see* R.R. at 1089a-1101a, nor was any testimony offered at trial about whether the Township treats buildable and non-buildable lots differently for purposes of taxation. In addition, it is not clear that permit applications and engineering studies, without Appellees taking other, more significant steps, are enough to show that they reasonably relied to their detriment on the Township for the belief that Lot 9 is buildable. None of Appellees' efforts to develop Lot 9 have progressed beyond preliminary planning efforts, so there is no proof that Appellees' expenditures for the applications and studies were "substantial." *Kreider*, 808 A.2d at 343. Finally, it is unclear how PennDOT's condemnation of part of Lot 9 is even relevant to whether Appellees reasonably relied upon Resolution 2005-02, given that Appellees themselves admitted that establishing direct access to Lot 9 was economically infeasible prior to PennDOT's eminent domain taking and subsequent straightening of Goshen Road. Accordingly, there is no way for us at this juncture to use the Trial Court's factual findings and legal conclusions to determine whether equitable estoppel should be applied in Appellees' favor. Therefore, in light of the Trial Court's failure to consider whether equitable estoppel can be applied here, as well as the ambiguities and deficiencies of the record, as currently constituted, we deem it necessary to remand this matter to the Trial Court.

## V. Conclusion

On the basis of the foregoing analysis, we vacate the Trial Court's July 22, 2019 order, through which the Trial Court denied the Township's and the Rosenblums' respective Motions for Post-Trial Relief. Furthermore, we remand this matter to the Trial Court, so that it can take additional evidence, limited to whether Appellees can properly invoke the doctrine of equitable estoppel to render Lot 9 buildable, and then issue supplemental or amended factual findings and legal conclusions addressing this issue.

_____
ELLEN CEISLER, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Township of Radnor, : 
               Appellant : 
               : 
       v. : No. 1665 C.D. 2019
               : 
Goshen Holding Company, Inc. : 
and C.F. Holloway, III : 

Township of Radnor : 
               : 
       v. : No. 1691 C.D. 2019
               : 
Goshen Holding Company, Inc. and : 
C.F. Holloway, III : 
               : 
Appeal of: Jeffrey S. Rosenblum and : 
Leonor R. Rosenblum : ARGUED: June 12, 2020

# **O R D E R**

AND NOW, this 20th day of July, 2020, the Court of Common Pleas of Delaware County's (Trial Court) July 22, 2019 order, through which the Trial Court denied Appellant Township of Radnor and Appellants Jeffrey S. and Leonor R. Rosenblum's respective Motions for Post-Trial Relief, is VACATED. This matter is REMANDED to the Trial Court for proceedings consistent with the foregoing opinion.

Jurisdiction relinquished.

 

_____
ELLEN CEISLER, Judge